# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

QBE SPECIALTY INSURANCE
COMPANY, a North Dakota Corporation,

                  Plaintiff,

    v.

TLC SAFETY CONSULTANTS, INC.,
et al.,

                  Defendants.

_____/

CASE NO. 1:11-cv-00233-SKO

**ORDER GRANTING IN PART AND
DENYING IN PART TLC SAFETY
CONSULTANT, INC.'S MOTION FOR
SUMMARY JUDGMENT**

(Docket No. 34)

## I.   INTRODUCTION

On November 1, 2011, Defendant TLC Safety Consultants, Inc. ("TLC") filed a motion for summary judgment (Doc. 34.) TLC's motion was heard on June 13, 2012. Michael D. Ott, Esq., appeared on behalf of Defendant TLC, Jose Masso, Esq., appeared on behalf of Plaintiff QBE Specialty Insurance Company ("QBE"), and Stephanie Grewal, Esq., appeared on behalf of Defendant Pipkin Detective Agency, Inc. ("Pipken"). (*See* Doc. 43.) For the reasons set forth below, TLC's motion for summary judgment is GRANTED in part and DENIED in part.

## II.   FACTUAL BACKGROUND

### A.   Plaintiff's Complaint

On February 11, 2011, QBE filed this civil action against Defendants TLC and Pipkin asserting claims for breach of contract, negligence, subrogation, indemnity, and declaratory relief. QBE seeks to recover damages and costs incurred by it and its insured, Safe Harbor Adult Day Health Care Center, Inc. ("Safe Harbor") in defending and settling a civil action for negligence brought by Josephine Diaz against Safe Harbor.

Safe Harbor was an adult health care center located in Fresno, California.  Safe Harbor provided day health care services for adults suffering from various mental and physical disabilities. In providing services, Safe Harbor employed van drivers to transport its clients/patients to and from the Safe Harbor facility.  (Complaint ("Cmplt.") Doc. 1, ¶ 10.)

On September 21, 2005, Safe Harbor hired Gilbert Garcia Chavez to work as a van driver. (Cmplt., Doc. 1, ¶ 11.)  Prior to hiring Mr. Chavez, Safe Harbor entered into a "partly oral and partly written agreement with TLC" pursuant to which TLC was to perform a pre-employment background check on Mr. Chavez and advise Safe Harbor during the hiring process.  (Cmplt., Doc. 1, ¶ 12.) According to the allegations in the complaint, TLC was responsible for contacting Mr. Chavez's prior employers, ensuring that Mr. Chavez underwent alcohol and drug testing, obtaining Mr. Chavez's California Department of Motor Vehicles driver history, ensuring Mr. Chavez was properly licensed to transport individuals with disabilities, as well as advising Safe Harbor with respect to information discovered during the pre-employment screening.  (Cmplt., Doc. 1, ¶ 12.)   TLC examined Mr. Chavez' California Department of Motor Vehicles driver history and allegedly advised Safe Harbor that Mr. Chavez was properly licensed.  (Cmplt., Doc. 1, ¶ 15.)  TLC did not advise Safe Harbor of any administrative actions taken by the Department of Motor Vehicles with respect to Mr. Chavez' California driver's license.  (Cmplt., Doc. 1, ¶ 15.)

At the time the complaint was filed, Josephine Diaz was a 47-year-old woman diagnosed with a high functioning developmental disability with an IQ estimated to range from 40 to 56. (Cmplt., Doc. 1, ¶ 9.)  In January 2006, she enrolled as a participant in Safe Harbor's adult day health care program.  Between January 2008 and July 2008, she was transported between her home and

2

Safe Harbor's facility by its van, operated at times by Mr. Chavez. (Cmplt., Doc. 1, ¶ 22.) On or about July 28, 2008, Mr. Chavez' employment with Safe Harbor was terminated. (Cmplt., Doc. 1, ¶ 23.) Subsequently, on August 18, 2008, Ms. Diaz reported to Safe Harbor personnel that she had had repeated sexual encounters with Mr. Chavez. (Cmplt., Doc. 1, ¶ 24.) Following Ms. Diaz' disclosure, Mr. Chavez was charged with five felonies. (Cmplt., Doc. 1, ¶ 25.) Mr. Chavez entered a guilty plea and was sentenced to a five-year prison term. (Cmplt., Doc. 1, ¶ 25.)

Ms. Diaz then initiated a civil action against both Safe Harbor and Mr. Chavez as defendants. Ms. Diaz' amended complaint for negligence alleged that Safe Harbor negligently hired Mr. Chavez. (Cmplt., Doc. 1, ¶ 26.) Safe Harbor tendered its defense of the civil action to QBE, Safe Harbor's insurer. (Cmplt., Doc. 1, ¶ 27.) During the course of the state court civil action, Safe Harbor and QBE learned for the first time that (1) Mr. Chavez was arrested in December 2003 for assault with a deadly weapon and abuse of a co-habitant following a domestic dispute with his spouse (Cmplt., Doc. 1, ¶ 29); (2) a felony complaint was filed against Mr. Chavez in February 2004 alleging one count of abuse of a co-habitant (Cmplt., Doc. 1, ¶ 29); (3) Mr. Chavez' driver's license permitting him to operate a school bus was revoked on August 27, 2004, for acts of moral turpitude as a result of Mr. Chavez' 2003 arrest for domestic violence (Cmplt., Doc. 1, ¶ 30); (4) Mr. Chavez did not possess a special endorsement/certificate to his driver's license permitting him to lawfully transport individuals with disabilities (Cmplt., Doc. 1, ¶ 31); (5) the special endorsement/certificate to transport individuals with disabilities is only issued after a criminal screening is performed by the California Department of Justice and/or the Federal Bureau of Investigation (Cmplt., Doc. 1, ¶ 32); and that (6) Safe Harbor could not lawfully hire or employ Mr. Chavez absent the special endorsement/certificate (Doc. 1, ¶ 33).

Based upon this information, Safe Harbor – via QBE – settled the state-court action filed by Ms. Diaz against Safe Harbor for the sum of $850,000.00. (Cmplt., Doc. 1, ¶ 34.) Safe Harbor assigned to QBE all its claims, rights, and causes of action against TLC and Pipkin for their conduct in the course of the pre-employment screening and investigation of Mr. Chavez. (Cmplt., Doc. 1, ¶ 35.)

1    QBE filed a complaint asserting the following claims against TLC:  (1) breach of contract;

2    (2) negligence; (3) express subrogation; (4) equitable subrogation; (5) implied indemnity; (6) express

3    indemnity; (7) equitable indemnity; (8) contribution; and (9) declaratory relief.  As to the breach of

4    contract claim, QBE alleged that TLC and Safe Harbor entered into a partly oral and partly written

5    agreement.  The terms of the agreement required TLC to perform "a pre-employment background

6    check on Mr. Chavez and advise Safe Harbor during the hiring process so as to ensure that Safe

7    Harbor complied with all applicable California and Federal regulations concerning the transport of

8    individuals with disabilities."  (Cmplt., Doc. 1, ¶ 12.)  Specifically, TLC was alleged to be

9    responsible "for contacting Mr. Chavez' prior employers, ensuring Mr. Chavez underwent alcohol

10   and drug testing, obtaining Mr. Chavez' California Department of Motor Vehicles driver history,

11   ensuring Mr. Chavez was properly licensed to transport individuals with disabilities, as well as

12   advising Safe Harbor with respect to any information discovered during the foregoing pre-

13   employment screening process."  (Cmplt., Doc. 1, ¶ 12.)  QBE alleges that TLC breached the

14   contract in the following ways:

15       [B]y failing to adequately contact Chavez's prior employer at the Dos Palos Oro
16       Loma Joint School District so as to discover and apprise Safe Harbor of Chavez's
         prior misconduct in pursing his lips in a kissing fashion at two female students.

17   (Cmplt., Doc. 1, ¶ 37.)

18       [B]y failing to advise Safe Harbor that Chavez's endorsement/certificate permitting
         him to operate a school bus was revoked on August 27, 2004[,] pursuant to Cal. Veh.
19       Code § 13370 due to Chavez's 2003 arrest for domestic violence.

20   (Cmplt., Doc. 1, ¶ 38.)

21       [B]y failing to determine and ensure that Chavez possessed the special
         endorsement/certificate, mandated by Cal. Veh. Code § 12523.6(a)(1), to his driver
22       license permitting him to lawfully transport individuals with disabilities.

23   (Cmplt., Doc. 1, ¶ 39.)

24       [B]y failing to advise Safe Harbor that Chavez did not possess the special
         endorsement/certificate, mandated by Cal. Veh. Code § 12523.6(a)(1), to his driver
25       license permitting him to lawfully transport individuals with disabilities.

26   (Cmplt., Doc. 1, ¶ 40.)

27   ///

28   ///

4

[B]y failing to determine and ensure that Chavez underwent a criminal screening performed by the California Department of Justice and/or the Federal Bureau of Investigation in order for the foregoing special endorsement/certificate permitting the transport of disabled individuals to issue under Cal. Veh. Code § 12523.6(b).

(Cmplt., Doc. 1, ¶ 41.)

[B]y failing to advise Safe Harbor that Chavez was required to undergo a criminal screening performed by the California Department of Justice and/or the Federal Bureau of Investigation in order for the foregoing special endorsement/certificate permitting the transport of disabled individuals to issue under Cal. Veh. Code § 12523.6(b).

(Cmplt., Doc. 1, ¶ 42.)

[B]y failing to advise Safe Harbor that pursuant to Cal. Veh. Code § 12523.6(d), Safe Harbor could not lawfully hire or employ Chavez without the foregoing special endorsement/certificate.

(Cmplt., Doc. 1, ¶ 43.)

QBE's claim as to TLC's negligence is predicated on the duties arising out of the agreement with Safe Harbor, and the alleged breaches of those duties are the same as those alleged in the contract action.

**B.    Procedural Background**

Discovery in this case was opened on May 18, 2011.  Non-expert discovery was set to close on June 29, 2012.  (Doc. 17.)  On May 15, 2012, prior to the close of discovery, TLC filed a motion for summary judgment.  (Doc. 34.)  The motion was predicated on deposition testimony offered by Ms. Joanie Ballantyne, Safe Harbor's owner.  Ms. Ballantyne was deposed in two separate sessions, the first on March 13, 2012, and the second on May 16, 2012 – one day after TLC's motion for summary judgment was filed.  At the May 16, 2012, deposition, Ms. Ballantyne made corrections to her March 13, 2012, deposition that materially affected TLC's pending motion for summary judgment.  In opposing the motion, QBE relied on many of the corrections made by Ms. Ballantyne.

In response to Ms. Ballantyne's additional testimony and to the arguments raised by QBE in its opposition papers, TLC filed a reply brief and submitted additional evidence for consideration. QBE did *not* object to the submission of this evidence, did *not* request to file a sur-reply, and was provided an opportunity to address TLC's reply papers and additional evidence at the June 13, 2012, hearing.  Thus, as discussed in this order, the evidence submitted in support of TLC's reply brief will

1    be considered by the Court. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996), *cert. denied*

2    522 U.S. 808 (1997) ("Where new evidence is presented in a reply to a motion for summary

3    judgment, the district court should not consider the new evidence without giving the [non]-movant

4    an opportunity to respond.").

### III.   DISCUSSION

6    **A.   Legal Standard**

7         Summary judgment is appropriate when it is demonstrated that there exists no genuine issue

8    as to any material fact, and that the moving party is entitled to judgment as a matter of law.   Fed.

9    R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Fortyune v. Am. Multi-*

10   *Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004).   The party seeking summary judgment bears the

11   initial burden of informing the court of the basis for its motion and of identifying the portions of the

12   declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of

13   material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Soremekun v. Thrifty Payless,*

14   *Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).   A fact is "material" if it might affect the outcome of the suit

15   under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *United*

16   *States v. Kapp*, 564 F.3d 1103, 1114 (9th Cir. 2009).   A dispute is "genuine" as to a material fact if

17   there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.

18   *Anderson*, 477 U.S. at 248; *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir.

19   2010).

20        Where the moving party will have the burden of proof on an issue at trial, the movant must

21   affirmatively demonstrate that no reasonable trier of fact could find other than for the movant.

22   *Soremekun*, 509 F.3d at 984.   Where the non-moving party will have the burden of proof on an issue

23   at trial, the movant may prevail by presenting evidence that negates an essential element of the non-

24   moving party's claim or by merely pointing out that there is an absence of evidence to support an

25   essential element of the non-moving party's claim. *See James River Ins. Co. v. Schenk, P.C.*,

26   523 F.3d 915, 923-24 (9th Cir. 2008).   If a moving party fails to carry its burden of production, then

27   "the non-moving party has no obligation to produce anything, even if the non-moving party would

28   have the ultimate burden of persuasion." *Nissan Fire* & Marine Ins. Co., Ltd. v. Fritz Companies,

6

Inc., 210 F.3d 1099, 1102-03 (9th 2000).  If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Nissan Fire*, 210 F.3d at 1103.  The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 n.14 (9th Cir. 2008) (quoting Fed. R. Civ. P. 56(e)).

The opposing party's evidence is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587; *Stegall v. Citadel Broad., Inc.*, 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1163 (E.D. Cal. 2008); *UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial."  *Del Carmen Guadalupe v. Agosto*, 299 F.3d 15, 23 (1st Cir. 2002) (internal quotation marks and citations omitted); *See Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007); *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249-50; *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006), *as amended in* 436 F.3d 1050 (9th Cir. 2006).

Additionally, the court has discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a material fact where the evidence is not set forth in the opposing papers with adequate references.  *See Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1017 (9th Cir. 2010); *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009); *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 2031 (9th Cir.

2001).  If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment.  *Nissan Fire*, 210 F.3d at 1103.

**B.   Undisputed Facts**

For purposes of this motion, the following facts are not disputed by the parties.  At all relevant times, QBE was the insurer of Safe Harbor Adult Day Health Care Center.  (Doc. 34-1, Defendant's Statement of Undisputed Material Facts ("DUMF"), ¶ 2; Doc. 40, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("PRDUMF"), ¶ 2.)  At all times relevant, Joanie Ballantyne was the owner of Safe Harbor.  (Doc. 34-1, DUMF ¶ 9; Doc. 40, PRDUMF ¶ 9.)  In September 2005, Safe Harbor hired Mr. Chavez as a van driver.  (Doc. 34-1, DUMF ¶ 3; Doc. 40, PRDUMF ¶ 3.)  Ms. Diaz is a developmentally disabled individual who was a participant at Safe Harbor.  (Doc. 34-1, DUMF ¶ 4; Doc. 40, PRDUMF ¶ 4.)  As part of Mr. Chavez' duties for Safe Harbor, he was to transport Ms. Diaz between her home and Safe Harbor.  (Doc. 34-1, DUMF ¶ 5; Doc. 40, PRDUMF ¶ 5.)  Ms. Diaz sued Safe Harbor and Mr. Chavez for a sexual assault perpetrated by Mr. Chavez while he was working for Safe Harbor ("*Diaz* case").  (Doc. 34-1, DUMF ¶ 6; Doc. 40, PRDUMF ¶ 6.)  On behalf of Safe Harbor, QBE settled Ms. Diaz' claims against Safe Harbor.  (Doc. 34-1, DUMF ¶ 7; Doc. 40, PRDUMF ¶ 7.)  QBE is now subrogated to Safe Harbor's claim for that settlement, and seeks to recover from TLC and Pipkin amounts paid to Ms. Diaz.  (Doc. 34-1, DUMF ¶ 8; Doc. 40, PRDUMF ¶ 8.)

The parties do not dispute that the complaint alleges TLC failed to advise Safe Harbor regarding Mr. Chavez' "misconduct in pursing his lips in a kissing fashion to two female students" at the time he worked for Dos Palos (Doc. 34-1, DUMF ¶ 10; Doc. 40, PRDUMF ¶ 10),TLC failed to advise Safe Harbor that Mr. Chavez' bus certificate was revoked (Doc. 34-1, DUMF ¶ 11; Doc. 40, PRDUMF ¶ 11), and that TLC "should have told Safe Harbor about the certification requirement in the California Vehicle Code § 12523.6"  (Doc. 34-1, DUMF ¶ 12; Doc. 40, PRDUMF ¶ 12).[1]

---

[1] The Court notes that while the parties appear to agree *the complaint alleges* that "TLC should have told Safe Harbor about the certification requirement in the California Vehicle Code § 12523.6," that is not an express allegation contained in the complaint.  Interestingly, the evidence cited to support this "undisputed fact" is not the complaint; it is deposition testimony of Joanie Ballantyne.  (*See* Doc. 34-1, DUMF ¶ 12.)

**C.      Ms. Ballantyne's Second Deposition Testimony Will Not Be Disregarded as Sham**

In its reply brief, TLC contends that Ms. Ballantyne's second-session deposition testimony, relied on by QBE in opposing TLC's motion for summary judgment, was taken after TLC's motion was filed and contradicts her first-session deposition testimony without explanation in an effort to create a disputed issue of material fact that defeats TLC's motion.  As a result, TLC maintains that Ms. Ballantyne's second-session deposition testimony should be disregarded as sham for purposes of considering TLC's motion for summary judgment.

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  The sham-affidavit rule is necessary because, "if a party who has been examined at length in deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Kennedy*, 952 F.2d at 266 (quoting *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985)).

This rule, however, is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence. *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009).  "Aggressive invocation of the rule also threatens to ensnare parties who may have simply been confused during their deposition testimony and may encourage gamesmanship by opposing attorneys." *Id*.  As a result, the Ninth Circuit has instructed that the sham-affidavit rule "be applied with caution." *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1264 (9th Cir. 1993).

Specifically, the Ninth Circuit has "fashioned two important limitations on a district court's discretion to invoke the shame affidavit rule." *Van Asdale*, 577 F.3d at 998.  First, the district court must make a factual determination that the contradiction was actually a sham. *Id.*  Second, the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit. *Id.* at 998-99.  Thus, "the non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake,

1   or newly discovered evidence afford no basis for excluding an opposition affidavit." *Messick v.*

2   *Horizon Indus., Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

3          One of the central issues in this case is the scope of the agreement between TLC and Safe

4   Harbor – in other words, the scope of the services TLC agreed to provide to Safe Harbor.  As the

5   owner of Safe Harbor, Ms. Ballantyne was questioned extensively at her first deposition by TLC's

6   counsel regarding the terms of that agreement.  TLC argues that Ms. Ballantyne stated multiple times

7   in her first deposition that she hired TLC to assist Safe Harbor in complying with all the

8   requirements of the California Department of Motor Vehicles ("DMV"), and *only* those

9   requirements.  Specifically, TLC cites to Ms. Ballantyne's first-session deposition testimony:

10         Q:    What did you hire [TLC] to do?
           A:    To make sure that we met all the requirements of the DMV.
11
    (Doc. 34-3, Exh. A, Ballantyne Depo., 29:3-5.)
12
           Q:    . . . but does that basically describe everything that they had agreed to do?
13         A:    Yes.  Make sure that we were in compliance with the DMV.

14  (Doc. 34-3, Exh. A, Ballantyne Depo., 38:1-4.)

15         Q:    And [TLC's] job was to make sure that that particular driver was in
                 compliance with DMV requirements?
16         A:    Absolutely.

17  (Doc. 34-3, Exh A., Ballantyne Depo., 41:3-6.)

18         Q:    Okay.  And do you remember anything that was said at that in-service about
                 what needed to be done?
19         A:    Well, again, it was compliance to – for DMV.  That's was what I was
                 interested in.
20         Q:    Okay.  How did you decide that that's what you needed was compliance with
                 DMV?
21         A:    Well, because I felt that I wanted to be in compliance.  I wanted everything
                 to be squeaky clean.  And that way, they presented that, that would keep my
22               records, make sure that the records were updated, make sure that notification
                 of the drivers, everything that we had to have for DMV.  It was quite – quite
23               a bit of information.

24  (Doc. 34-3, Exh. A, Ballantyne Depo., 41:18-42:5)

25         A:    [Bill] told me that [TLC] would do everything that the DMV required.

26  (Doc. 34-3, Exh. A, Ballantyne Depo., 66:13-14.)

27         Q:    Okay.  To your knowledge, was CHP ever involved in any – having any
                 requirements for your drivers or vans?
28         A:    Well, I don't believe so.  I think it was all DMV.

                                               10

1
Q:    And you know CHP and DMV are different things?
A:    Yes.
2
Q:    And you think all your contacts were DMV?
A:    To my knowledge, yes.
3
Q:    And all requirements you had to meet were DMV requirements?
A:    That's my understanding.
4
Q:    Okay.  Where did you first get that understanding?  Is that something you
      obtained when you were doing this work for yourself?
5
A:    Well, yes.  That's what I was told over the years.  And then when I first met
      with Bill – I believe that was his name – he told me DMV.
6
(Doc. 34-3, Exh. A, Ballantyne Depo., 67:1-18.)
7
A:     . . . and then we talked about what [Bill] could do.  And he assured me that
8
       everything that DMV would require, he would meet.
9
(Doc. 34-3, Exh. A, Ballantyne Depo., 70:9-11.)
10
A:    I felt that that was an appropriate thing that [TLC] would give me everything
      I needed to be in compliance with DMV.
11
(Doc. 34-3, Exh. A, Ballantyne Depo., 71:4-6.)
12
Q:    What was your understanding of what else they would do besides drug
13
      testing?
A:    They would keep me in compliance, like I said before.  They would do the
14
      add-ons, the deletions – I don't know.  It was a whole list of things they
      would do, whatever DMV – whatever the requirements were.
15
Q:    Can you remember those things?
A:    I can't.
16
Q:    Okay.  But your understanding is what they – TLC committed to do for you
      was to do anything that's necessary to meet DMV requirements?
17
A:    That's exactly right.  And that's why I felt so comfortable, because I was
      meeting DMV requirements.  And when DMV came in, everything that was
18
      there I was having – you know, I was okay on.
19
(Doc. 34-3, Exh A, Ballantyne Depo., 71:16-72:5.)
20
Q:    Okay.  Was TLC supposed to provide any service to Safe Harbor that did not
      involve compliance with DMV regulations?
21
A:    Everything was supposed to be in compliance with DMV.
Q:    Okay.   Other regulations about other things was not part of TLC's
22
      responsibility; is that right?
A:    I don't know what that would be.
23
(Doc. 34-3, Exh A, Ballantyne Depo., 82:8-15.)
24
Q:    So the first question was, did TLC have any responsibility to do anything
25
      other than compliance with DMV regulations?
A:    You mean, insofar as patient care?
26
Q:    No, I'm talking about the vans and the drivers.
A:    No, it was strictly the vans – the drivers.
27
Q:    Right.  But it was only for DMV regulations; right?
A:    Yes.
28

Q:     If some other agency, let's say CHP had some control over something or certification of something, that's was not TLC's responsibility; is that right?

A:     I don't think so.  And I never ran into that problem, that I can remember.

(Doc. 34-3, Exh A, Ballantyne Depo., 83:1-14.)

A:     And they told – [TLC] kept telling me, "Don't worry about it.  It's everything that you have to do for DMV.  You won't have any trouble."

(Doc. 34-3, Exh A, Ballantyne Depo., 92:15-17.)

A:     I had no idea what more they could do.  I was happy with just being in compliance with DMV.

(Doc. 34-3, Exh. A, Ballantyne Depo., 93:12-13.)

A:     I didn't ask them to do anything more, other than to be in compliance with DMV.

(Doc. 34-3, Exh. A, Ballantyne Depo., 93:18-19.)

A:     Yeah.  DMV was the main one that –

Q:     Well, now you're saying the main one.  Before you told me it was the only one.

A:     DMV was the only one that I dealt with, with them.  I mean, it had to deal – the regulations said we had to deal with Federal and State laws, but when DMV came in, you know, that's what we – that's what we looked for, from them.

(Doc. 34-3, Exh. A, Ballantyne Depo., 113:3-10.)

Q:     So you looked to [TLC] to tell you who was appropriate and who wasn't?

A:     Who was – was good enough to drive, who had everything that DMV said that they were supposed to have.

(Doc. 34-3, Exh. A. Ballantyne Depo., 116:21-25.)

TLC claims Ms. Ballantyne was provided "ample" opportunities to correct these statements, but she did not do so.  (Doc. 42, 2:27-3:1.)[2]  In the second session of her deposition on May 16, 2012, Ms. Ballantyne stated that she wished to change and correct her prior testimony as it related to her statements about DMV requirements.  Specifically, she said that when she had referred to the DMV in the first session of her deposition, she actually meant CHP in some instances. (Doc. 42-2, Exh. B., Ballantyne Depo., 143:1-20.)  Ms. Ballantyne testified in relevant part as follows:

A:     I made reference to DMV, and it was CHP, California Highway Patrol.  And I made reference to DMV, a lot of the things.

---

[2] Citations to pages in the parties' briefs reference the CM/ECF pagination at the tope of the documents.

| 1 | Q: | So what you're saying is every time you said DMV in the previous deposition, what you meant was CHP? |
| 2 | A: | I would say 90 percent, but I haven't seen the deposition so I can't say. |
|   | Q: | . . . . How is it possible that you made that mistake?  How did you say DMV |
| 3 |   | when you meant CHP? |
|   | A: | Just an error. |
| 4 | Q: | Can you give me even one example of what you mean when you said DMV before, but now you think it's CHP? |
| 5 | A: | The inspections. |
|   | Q: | What inspections? |
| 6 | A: | The inspections to the vehicles. |
|   | Q: | Inspections of the vans owned by Safe Harbor? |
| 7 | A: | That's correct. |
|   | Q: | Is that what you're talking about? |
| 8 | A: | That's correct. |
|   | Q: | What about the inspections has to do with DMV or CHP? |
| 9 | A: | They were done by CHP, not DMV. |

10   (Doc. 42-2, Exh. B, Ballantyne Depo., 143:5-11; 143:18-144:7.)

| 11 | A: | In order for us to be in compliance with CHP, we had to be in compliance |
| 12 |   | with DMV.  TLC was supposed to provide that information to us, and if we weren't, then they would let us know.  And it says right here, DMV printout. |

13      . . .

| 14 | A: | All I know is we sent the drivers to [TLC]; they would check the license to make sure it was in compliance with DMV.  They made sure that we had a |
| 15 |   | printout – or they took a printout with them.  And if I remember correctly, TLC would get a printout while they were there, to the best that I can |
| 16 |   | remember.  You had to be in compliance with DMV to be in compliance with CHP. |

17   (Doc. 42-2, Exh. B, Ballantyne Depo., 163:22-164:1; 164:11-17.)

| 18 | Q [Mr. Lynn]: | when you say in compliance with CHP what do you mean by that? |
|   | A: | They had to have the correct driver's license – |
| 19 | Q: | "They" being the drivers? |
|   | A: | The employee, who was going to be driving.  They had to have the correct |
| 20 |   | passenger endorsement, they had to have completed a driving test from the Department of Motor Vehicle.  All of that was included in their driving |
| 21 |   | record for them to get a Class B passenger endorsement. |
|   | Q: | So that is what you mean when you say in compliance with DMV? |
| 22 | A: | DMV; right.  In order to even drive a vehicle they had to have that. |
|   | Q: | All right.  Now, when you say, as you've said, in compliance with CHP, what |
| 23 |   | exactly do you mean by that? |
|   | A: | Well, when CHP would come in, they would review the employee records of |
| 24 |   | the drivers. |

25      . . .

| 26 | A: | CHP would come into Safe Harbor, and they would, first of all, inspect the vehicles.  If they were okay, they'd put a tag on them.  After that, they would |
| 27 |   | come into the facility.  They would pull the driving records, they would pull the medical file, they would pull their personnel file. |

28   (Doc. 42-2, Exh. B, Ballantyne Depo., 165:12-166:6; 166:20-25.)

TLC's motion for summary judgment relied heavily on Ms. Ballantyne's first-session deposition testimony that the scope of the agreement between TLC and Safe Harbor was limited to ensuring Safe Harbor's drivers' compliance with the DMV requirements only.  Thus, in its reply brief, TLC requests that the Court treat the corrections Ms. Ballantyne offered at the second-session of her deposition as sham testimony.

The distinction between a DMV requirement and a CHP requirement is not necessarily readily apparent or unambiguous.  For example, as it relates to another issue in TLC's motion for summary judgment, the parties dispute whether the DMV or the CHP enforces Section 12523.6 of the California Vehicle Code, and whether it should be construed as a "DMV requirement."  QBE argues that the word "department" contained in Section 12523.6 refers to the DMV, pursuant to California Vehicle Code Section 290.  Section 290 states that the word "department" shall refer to the Department of Motor Vehicles; thus, QBE argues Section 12523.6 must be considered a "DMV regulation."  TLC argues that Section 12523.6 is mandated by the CHP, not the DMV, and notes that "the statutes" refer to the "Department of California Highway Patrol as the agency to which an application for a certificate under Section12523.6 is made, where the fee is paid, by whom the background check is completed, and the enforcement agency." (Doc. 42, 8:10-13.) TLC argues that DMV's "act of printing out the certificate on the license is only ministerial." (Doc. 42, 8:13-14.) Although resolution of this dispute is irrelevant for purposes of TLC's argument that Ms. Ballantyne's testimony should be considered sham, it exemplifies that making a distinction between a "DMV requirement" and a "CHP requirement" is not black and white.  Ms. Ballantyne's reference to DMV in the first session of her deposition may have resulted from a good-faith mistake based on confusion regarding which agency enforced different sections of the California Vehicle Code.  In other words, questions posed to Ms. Ballantyne about DMV requirements and regulations were not unambiguous questions with unambiguous answers. *See Kennedy*, 952 F.2d at 266; *see also Lane v. Celotex*, 782 F.2d 1526, 1532 (11th Cir. 1986) (to consider later-offered testimony sham, "[t]he

1  earlier deposition testimony must consist of 'clear answers to unambiguous questions which negate

2  the existence of any genuine issue of material fact'").[3]

3     TLC's argument that Ms. Ballantyne's original testimony could not have been a mistake

4  because she was asked whether CHP requirements had anything to do with TLC's obligations to Safe

5  Harbor is not persuasive.  A distinction between a "DMV requirement" or a "CHP requirement" is

6  apparently a somewhat difficult distinction to draw, as evidenced by the parties' dispute about

7  Section 12523.6.  This is particularly so where the DMV promulgates regulations under the

8  California Vehicle Code that the CHP in turn enforces.  The fact that a lay witness cannot articulate

9  the difference between the agencies and each of their requirements is not especially surprising.  For

10  example, the DMV may require compliance with certain CHP requirements, such as  Biennial

11  Inspection of Terminals ("BIT") Inspections, which are applicable to certain applicants seeking a

12  DMV-issued Motor Carrier Permit.  While Ms. Ballantyne may appreciate the fact that the DMV and

13  the CHP are two separate entities, her deposition testimony reflects confusion as to which agency

14  regulated various aspects of requirements applicable to Safe Harbor.

15     Ms. Ballantyne's confusion over this issue is also apparent when considering testimony

16  offered by Ms. Mitchell, the owner of TLC.  Ms. Mitchell testified that TLC collected information

17  on Safe Harbor's prospective drivers that became part of Safe Harbor's files which the CHP reviewed

18  during the course of its BIT Inspections at Safe Harbor.  (Doc. 38, Exh. C, Mitchell Depo., 28:3-10).

19  Ms. Mitchell also testified that TLC provided driver qualification services to Safe Harbor which

20  included providing "driver qualification files" as required by Federal and California law.  (Doc. 38,

21  Exh. C, Mitchell Depo., 40:24-41:6; 43:9-24.)  Based on Ms. Mitchell's testimony, arguably TLC

22  was collecting certain information for the CHP BIT Inspections that did not necessarily pertain *only*

23

24  [3] Deposition questions and answers such the one cited below highlight the ambiguity of the questions and the
confusion of the witness:

25  Q:     Okay.  Was TLC supposed to provide any service to Safe Harbor that did not involve compliance with DMV
       regulations?

26  A:     Everything was supposed to be in compliance with DMV.
   Q:     Okay.  Other regulations about other things was not part of TLC's responsibility; is that right?

27  A:     I don't know what that would be.

28  (Doc. 34-3, Exh A, Ballantyne Depo., 82:8-15.)

to "DMV requirements."  Thus, when Ms. Ballantyne clarified that she had mistakenly referred to DMV when she meant CHP, this appears to be a legitimate clarification.

In sum, the Court cannot find that the contradictions between the first and second sessions of Ms. Ballantyne's deposition are actually a sham.  The contradictions are not clear and unambiguous.[4]  Questions posed to Ms. Ballantyne about "DMV requirements/regulations"[5] generally, especially without reference to an obligation imposed by DMV requirements, are ambiguous.  The fact that Ms. Ballantyne attempted to walk the cat back in her second May 16, 2012, deposition is reasonable under the circumstances and appears to be the result of confusion at the first deposition in answering questions that were not entirely clear-cut.  In keeping with the Ninth Circuit's admonition that the "sham-affidavit rule" be applied with caution, the Court declines to treat the corrections offered at Ms. Ballantyne's second, May 16, 2012, deposition as sham testimony. *ACandS, Inc.*, 5 F.3d at 1264.

**D.    There is Insufficient Evidence to Create a Triable Issue Whether TLC Breached its Obligation to Adequately Contact Prior Employers of Mr. Chavez[6]**

**1.    The Allegations of the Complaint**

QBE's complaint asserts that Safe Harbor and TLC entered into a partly oral and partly written agreement that required TLC to perform a "pre-employment background check on Mr. Chavez and advise Safe Harbor during the hiring process to ensure that Safe Harbor complied with all applicable California and Federal regulations concerning the transport of individuals with disabilities." (Cmplt., Doc. 1, ¶ 12.)  According to the complaint, "TLC was responsible for contacting Chavez's prior employers, ensuring Chavez underwent alcohol and drug testing, obtaining Chavez's California Department of Motor Vehicles driver history, ensuring Chavez was properly licensed to transport individuals with disabilities, as well as advising Safe Harbor with respect to any

---

[4] For example, questions about the difference between CHP and DMV requirements and which agency enforces certain requirements are not as clear-cut as questions regarding whether a stop light was red or green.

[5] Counsel's questions to Ms. Ballantyne during the deposition used the terms "DMV requirements" and "DMV regulations" interchangeably.

[6] In its complaint, QBE alleged only one claim for breach of contract against Defendants TLC and Pipkin. However, because there are several different alleged breaches of the contract, the Court will address each alleged breach in turn as it relates to TLC.

1  information discovered during the foregoing pre-employment screening process." (Cmplt., Doc. 1,

2  ¶ 12.)

3       As it related to the "pre-employment background check," QBE alleges that TLC forwarded

4  to Mr. Chavez' supervisor at his prior employer, the Dos Palos Oro Loma School District ("Dos

5  Palos"), a former employee evaluation form to complete regarding Mr. Chavez's previous work

6  performance as a school bus driver for the district.   QBE contends that TLC failed to orally

7  communicate with Mr. Chavez' former supervisor or contact the School District's Human Resources

8  department regarding Mr. Chavez' work performance. (Cmplt., Doc. 1, ¶ 16.)  QBE alleges that by

9  failing to adequately contact Mr. Chavez' prior employer at Dos Palos, TLC failed to discover and

10  apprise Safe Harbor of Mr. Chavez' prior misconduct during his employment for the School District

11  in pursing his lips in a kissing fashion at two female students.   TLC's failure to discover this

12  information is an alleged breach of TLC's obligations under its agreement with Safe Harbor.

13  (Cmplt., Doc. 1, ¶ 37.)

14       **2.       TLC's Motion for Summary Judgment**

15       The essential elements of a breach of contract claim include (1) the existence of a contract;

16  (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) resulting

17  damage to plaintiff.  *Amelco Elec. v. City of Thousand Oaks*, 27 Cal. 4th 228, 243 (2002) (citing 4

18  Witkin, Cal. Procedure (4th ed. 1997) Pleading, 476, p. 570).  TLC does not dispute the existence

19  of the alleged contract, QBE's performance under the contract, or the resulting damage to QBE.

20  Rather, TLC asserts it is undisputed that it was not obligated to provide any service to Safe Harbor

21  that did not involve compliance with DMV requirements.  As there is no DMV requirement that Safe

22  Harbor determine the employment background of its prospective drivers, "and certainly not to the

23  extent that the alleged 'pursed lips' incident would have been discovered," TLC cannot be shown to

24  be in breach of its contract or its tort duty to Safe Harbor.  (Doc. 34-2, 5:12-17.)  In essence, TLC

25  asserts QBE has not presented evidence sufficient to create a triable issue of fact that TLC breached

26  the contract by failing to adequately contact Mr. Chavez' former employer because there is no

27  evidence that TLC had such a duty under the agreement.

28

### 3.      QBE's Opposition to TLC's Motion

As discussed above, the day after TLC's motion for summary judgment was filed, Ms. Ballantyne's deposition was completed in a second session on May 16, 2012.  In her May 16, 2012, testimony, Ms. Ballantyne corrected and clarified her March 13, 2012, deposition testimony in several respects.  Specifically, she stated that in her March 13, 2012, testimony she referred to the DMV several times when she meant to refer to the CHP.  (Doc. 38, Exh. B, Ballantyne Depo., 143:1-11.)  In essence, she stated that TLC assisted Safe Harbor not only with compliance with DMV requirements, but also with CHP requirements, particularly as they related to CHP's BIT Inspections.  (Doc. 38, Exh. B., Ballantyne Depo., 166:2-9.)

Citing to Ms. Ballantyne's May 16, 2012, deposition testimony, QBE disputes TLC's assertion that TLC was hired "in order to make sure that Safe Harbor met all the requirements of the California Department of Motor Vehicles [], and nothing more."  (Doc. 40, PRDUMF ¶ 13.)  Averring that the terms of the parties' agreement were broader than compliance only with DMV requirements, QBE argues there is a material dispute regarding the extent to which TLC was obligated to contact Mr. Chavez' prior employers, a material fact as to one of the controlling terms of the parties' agreement.  (Doc. 37, 7:15-16; Doc. 39, Plaintiff's Separate Statement of Disputed Facts ("PSDF") ¶ 13.)  In violation of its duty to adequately contact Mr. Chavez' former employer, TLC failed to discover that Mr. Chavez was disciplined by Dos Palos for allegedly pursing his lips in a kissing fashion at two female students.  (Doc. 37, 8:22:28; Doc. 39, PSDF ¶ 14.)

### 4.      TLC's Reply Brief

TLC maintains that, even to the extent there is a dispute whether TLC had a duty to contact former employers, it is not material.  Even assuming that TLC was obligated to contact Mr. Chavez' former employer, there is no evidence that TLC breached the agreement in failing to discover Mr. Chavez' disciplinary event at Dos Palos.  First, TLC did contact Mr. Chavez' former employer.  Second, QBE fails to supply any evidence that TLC was required to contact Mr. Chavez' employer in a manner beyond the request for information TLC made of Dos Palos.    (Doc. 42, 9:1-19.)  Additionally, a Dos Palos representative testified that a record of the "pursed-lips incident" was not kept in Mr. Chavez' personnel file such that it could have been discovered, even to the extent TLC

had a duty to uncover that information.  (Doc. 42, 9:13-15; Doc. 38, Exh. I, (memo from Timothy Woodward to Gilbert Chavez regarding pursed-lips incident, stating, "[t]his is a record of discussion and will not be placed in your personnel file.").)  As such, TLC maintains that QBE has not presented evidence sufficient to create a material dispute as to whether that TLC breached the contract by failing to discover the "pursed-lips" incident.

**5.    Dispute As to Whether TLC Was to Contact Prior Employers of Safe Harbor's Prospective Drivers is Not Material**

The Court finds that TLC sufficiently met its initial burden on summary judgment by pointing to an absence of evidence establishing a material dispute whether TLC breached the agreement in failing to discover the pursed-lips disciplinary incident at Dos Palos.  Thus, the burden shifts to QBE to produce evidence sufficient to establish a triable issue of fact as to TLC's breach in this regard.

QBE claims that "the agreement mandated that [TLC] contact the prior employers of Safe Harbor's prospective drivers."  (Doc. 37, 4:24-25.)  Ms. Mitchell testified on behalf of TLC that, pursuant to its agreement with Safe Harbor, it contacted prospective drivers' prior employers by mailing the prior employer a form which the prior employer completed and returned to TLC.  To the extent TLC is disputing it had such an obligation,[7] a jury crediting Ms. Mitchell's testimony could determine that TLC *was* obligated to contact prior employers.  Nonetheless, this is not a *material* dispute.

There is no evidence that TLC breached a duty to contact Mr. Chavez' prior employer.  Instead, there is affirmative testimony and documentary evidence that TLC did "contact" Mr. Chavez' prior employer by sending Dos Palos a form requesting information about Mr. Chavez' employment with Dos Palos, which it completed and returned to TLC.  (*See* Doc. 38, Exh. J; Doc. 38, Exh. C, Mitchell Depo., 68:7-21.)  Further, the allegations of the complaint acknowledge that TLC contacted Dos Palos about Mr. Chavez' previous work experience as a bus driver.  (Cmplt., Doc. 1, ¶ 16.)

---

[7] TLC's initial motion indicated that, because Ms. Ballantyne testified TLC's only requirement was to ensure compliance with the DMV, and because contacting a prior employer is not a DMV requirement, there was no duty for TLC to contact a prior employer;  therefore, there could be no breach of the agreement in this regard.

1    QBE's allegations of breach are predicated on the assertion that TLC failed to make **adequate**

2    contact with Dos Palos under the terms of the parties' agreement.  (Cmplt., Doc. 1, ¶ 37.)

3          QBE's opposition and separate statement of disputed facts vacillate between asserting that

4    the parties' agreement required TLC to contact prior employers and assertions that the parties' dispute

5    the *extent* of TLC's duty to contact prior employers.  QBE offers no clear argument – let alone any

6    supporting evidence – showing *the extent* of TLC's duty to contact prospective drivers' prior

7    employers required more than the contact TLC made with Dos Palos.

8           To establish that TLC breached the agreement by failing to contact Dos Palos *adequately*,

9    QBE must present evidence of the nature and scope of TLC's duty to contact Dos Palos, which it has

10   failed to do.

11

12        **6.      No Triable Issue as to the Extent of TLC's Duty to Contact Prior Employers or**
                **TLC's Breach of the Agreement in This Regard**

13         Construing the evidence in the light most favorable to QBE, the evidence shows only that

14   TLC had an obligation to contact Mr. Chavez' prior employers, which Ms. Mitchell testified TLC

15   accomplished through the use of a questionnaire sent to Dos Palos that Dos Palos returned to TLC.

16   While Ms. Ballantyne testified she believed TLC was required to do something more with respect

17   to discovering the pursed-lips disciplinary incident at Dos Palos (Doc. 38, Exh. B, Ballantyne Depo.,

18   196:5-21), she did not testify what additional contact TLC was required to have with prior

19   employers.  *See U.S. v. One Parcel of Real Property*, 904 F.2d 487, 492 n.3 (9th Cir. 1990)

20   (conclusory allegations in an affidavit, unsupported by factual data, will not create a triable issue of

21   fact).  Ms. Ballantyne testified that, had she known about the pursed-lips incident, had it been

22   presented to her in writing, and had it been verified, she would "never have hired" Mr. Chavez.

23   (Doc. 38, Exh. A, Ballantyne Depo., 121:15-122:5.)  Ms. Ballantyne testified that TLC did not call

24   her to tell her any additional information about Mr. Chavez; instead, TLC told her Mr. Chavez was

25   "a good guy" and that "everything is okay."  (Doc. 38, Exh. B, Ballantyne Depo., 181:10-25.)

26         Ms. Ballantyne did not testify *how* former-employer references were to be verified by TLC

27   or the nature or scope of TLC's required contact with former employers.  Rather, when questioned

28   about the form that Dos Palos returned to TLC, Ms. Ballantyne testified that it was her understanding

1   that TLC was not required to do anything further with regard to a former employer other than ask

2   the former employer to fill out the form and send it back.  (Doc. 42-2, Exh. A, Ballantyne Depo.,

3   114:2-9.)

4          Finally, Ms. Ballantyne testified that when TLC received the form requesting information

5   from Dos Palos that did **not** reference the pursed-lips incident, TLC was obligated to "make [her]

6   aware of [the pursed lips incident]."   (Doc. 38, Exh. B, Ballantyne Depo., 197:25-198:3.)

7   Nonetheless, Ms. Ballantyne did not explain how TLC was to accomplish that given there was no

8   reference to the incident on the form or what follow-up TLC was obligated to undertake with Dos

9   Palos under the agreement.  (Doc. 38, Exh. B, Ballantyne Depo., 197:25-198:3.)  Ms. Ballantyne's

10  testimony does not contain facts that raise a triable issue that TLC's duty to contact former employers

11  included further actions; her testimony constitutes a conclusory allegation that TLC had a duty to

12  discover the pursed-lips incident.  *One Parcel of Real Property*, 904 F.2d at 492 n.3 (conclusory

13  allegations do not suffice to raise triable issues of fact).  Drawing all inferences in QBE's favor and

14  construing Ms. Ballantyne's testimony in the light most favorable to QBE, the testimony is

15  insufficient evidence for a reasonable jury to conclude that TLC was obligated to contact prior

16  employers for information beyond that which TLC sought from Dos Palos or to make additional

17  contact with Dos Palos.

18         As to Ms. Mitchell, she testified that on behalf of its clients, TLC contacted prior employers

19  by sending them a form requesting certain information.  (Doc. 38, Exh. C, Mitchell Depo.,66:16-

20  67:13.)  She testified that TLC forwarded this form to Dos Palos, Dos Palos completed the form and

21  returned it to TLC, and TLC forwarded the form to Safe Harbor.  (Doc. 38, Exh. C, Mitchell

22  Depo.,66:16-67:13; 69:1-23.)  She reported that TLC made no personal contact with Dos Palos, and

23  Safe Harbor never requested that TLC contact Mr. Chavez' prior employers in person.  (Doc. 38,

24  Exh. C, Mitchell Depo., 68:3-21.)   As with Ms. Ballantyne's testimony, this does not provide

25  evidence that TLC was obligated to contact former employers in a manner other than sending the

26  form to Dos Palos, that TLC was to make personal or additional contact with Dos Palos, or that Safe

27  Harbor asked TLC to do so.

28

1    QBE offers testimony from Timothy Woodward, a manager of human resources for Dos

2    Palos who was involved in disciplining Mr. Chavez related to the pursed-lips incident.  (Doc. 38,

3    Exh. H.)  While QBE cites this testimony, QBE does not set forth its relevance.  Mr. Woodward

4    explained the pursed-lips incident and his role in disciplining Mr. Chavez (Doc. 38, Exh. H,

5    Woodward Depo., 9:19-11:23), and testified that he reported the incident to his immediate

6    supervisor, the principal of Dos Palos (Doc. 38, Exh. H, Woodward Depo., 12:4-18).   Mr.

7    Woodward also testified that if a prospective employer was seeking information, that employer

8    would be directed to Mr. Weagel, the transportation director.  (Doc. 38, Exh. H, Woodward Depo.,

9    24:1-25:25.)  This is insufficient evidence to establish the extent and nature of TLC's duty in

10   contacting Mr. Chavez' prior employer.

11         Other than QBE's allegation in the complaint that TLC did not "adequately" contact Mr.

12   Chavez' prior employers (Cmplt., Doc. 1, ¶ 37) and QBE's argument in its opposition that the parties

13   dispute the extent to which TLC was obligated to contact Mr. Chavez' prior employers (Doc. 37,

14   7:15-16), there is no evidence regarding what contact or verification should have been made pursuant

15   to the agreement but was not.  *Flaherty v. Warehousemen, Garage & Serv. Station Emp.'s Local*

16   *Union No. 334*, 574 F.2d 484, 486 n. 2 (9th Cir. 1978) (assertions made in the complaint, legal

17   memoranda, or oral argument are not evidence and do not create issues of fact).  While there is

18   evidence to support a jury finding that TLC had an obligation to contact prior employers, and there

19   is affirmative evidence that TLC did contact Dos Palos, there is insufficient evidence as to the extent

20   of TLC's duty to contact prior employers such that a jury could find that TLC breached the agreement

21   by not discovering the pursed-lips incident.

22         Construing the evidence in the light most favorable to QBE, there is insufficient evidence

23   for a jury to find that TLC had a duty to make further or additional contact with Dos Palos and, in

24   turn, that TLC breached this duty by failing to discover the pursed-lips disciplinary incident at Dos

25   Palos.  Accordingly, TLC's motion for summary judgment as to this issue is GRANTED.

26

27

28

**E.      Triable Issue Exists Regarding  Whether TLC Breached its Obligation to Inform and Explain to Safe Harbor the Revocation of Mr. Chavez' Bus Certificate**

      **1.      The Allegations of the Complaint**

In its complaint, QBE asserts that during the pre-employment screening process, TLC examined Mr. Chavez' California Department of Motor Vehicles driver history and advised Safe Harbor that Mr. Chavez was properly licensed.   TLC did not advise Safe Harbor of any administrative actions taken by the Department of Motor Vehicles with respect to Mr. Chavez's driver license. (Cmplt., Doc. 1, ¶ 15.) QBE alleges that TLC breached the agreement by failing to advise Safe Harbor that Mr. Chavez' endorsement/certificate permitting him to operate a school bus was revoked on August 27, 2004, pursuant to California Vehicle Code § 13370 due to Mr. Chavez' 2003 arrest for domestic violence. (Cmplt., Doc. 1, ¶ 39.)

      **2.      TLC's Motion for Summary Judgment**

TLC argues that revocation of Mr. Chavez' school bus certificate is completely unrelated to Safe Harbor's compliance with DMV requirements. (Doc. 34-2, 5:18-19.) That Mr. Chavez' school bus driver certificate was revoked did not cause Safe Harbor to be out of compliance with the DMV because he was not transporting students for Safe Harbor. (Doc. 34-2, 5:19-24.)  Additionally, Ms. Ballantyne testified that DMV had not cited Safe Harbor for drivers who failed to have a certification. (Doc. 34-2, 5:24-25; Doc. 34-3, Ballantyne Depo., 33:8-34:5.)  Thus, QBE cannot establish that TLC breached the contract by failing to explain or inform Safe Harbor about the revocation of the bus driver certificate.

      **3.      QBE's Opposition to the Motion**

QBE contends that TLC was obligated to retrieve, explain, and communicate the driver history of Safe Harbor's prospective drivers, including that of Mr. Chavez. (Doc. 37, 4:15-17; Doc. 39, PSDF ¶ 10.)  QBE argues that TLC failed to give Safe Harbor any notice that the DMV had revoked Mr. Chavez' school bus driver certificate. Had Safe Harbor been given notice that the DMV revoked Mr. Chavez' school bus driver certificate, Safe Harbor would have learned that the revocation was due to a domestic violence arrest and conviction in 2004. (Doc. 39, PSDF ¶ 12.)

1   **4.     TLC's Reply to QBE's Opposition**

2   TLC avers that the evidence clearly establishes that TLC arranged for the DMV to send

3   printouts regarding Mr. Chavez' driving records every six months, and each one of the printouts

4   indicated that his school bus driver certificate had been revoked. (Doc. 42, 8:16-27.) Ms. Ballantyne

5   admitted that she received the form from Dos Palos stating that Mr. Chavez' school bus driver

6   certificate had been revoked.   (Doc. 42, 8:26-27.)   Given this notice to Safe Harbor, there is "no

7   argument that Safe Harbor did not receive this information."   (Doc. 42, 8:26-27.)

8   **5.     The Scope of TLC's Duty to Explain to Safe Harbor the Revocation of Mr.**
    **Chavez' Bus Certificate is Materially Disputed**
9

10   There is a material dispute as to the scope of TLC's duty to contact and advise Safe Harbor

11   about Mr. Chavez' driver history. QBE asserts that the evidence shows that Safe Harbor's agreement

12   with TLC required TLC to retrieve, explain, and communicate the driver history of Safe Harbor's

13   prospective drivers. (Doc. 38, 4:15-17; Doc. 39, PSDF ¶ 10.)   QBE cites to various parts of Ms.

14   Mitchell's deposition as evidence of this duty.   Ms. Mitchell testified that under its agreement with

15   Safe Harbor, TLC was to confirm whether prospective drivers had a valid license, "contact their

16   previous employer over the last two years, and also get a drug and alcohol testing history and their

17   accident history from those previous employers, and to document their driving experience." (Doc.

18   38, Exh. C, Mitchell Depo., 63:11-16.) Ms. Mitchell stated that the information as to Mr. Chavez'

19   school bus certificate revocation was provided to Safe Harbor on the form the School District

20   returned to TLC. (Doc. 38, Exh. C, 68:7-21; 69:1-23.)   Further, the revocation of the school bus

21   certificate was also on several DMV printouts, and Ms. Mitchell testified that she called Ms.

22   Ballantyne to inform her about the revocation of the bus certificate.   (Doc. 38, Exh. C, Mitchell

23   Depo., 69:4-10; 75:1-25; 78:11-21.)

24   Ms. Ballantyne's version of events differs from that of Ms. Mitchell's with respect to how

25   TLC was to explain and communicate prospective drivers' history pursuant to its agreement with

26   Safe Harbor.  According to Ms. Ballantyne, TLC would call Safe Harbor and explain "anything that

27   was of concern to them." (Doc. 38, Exh. A, Ballantyne Depo., 89:1-24; 104:10-25; 108:13-25.) Ms.

28   Ballantyne testified that TLC would call Safe Harbor to provide a verbal explanation of the driver

1  history; however, TLC failed to telephone Safe Harbor and explain Mr. Chavez' school bus driver

2  certificate revocation.  (Doc. 38, Exh. A, Ballantyne Depo., 108:13-25; 109:1-11.)  Ms. Ballantyne

3  stated that if drivers had a DMV problem, TLC would call her to inform her.  (Doc. 38, Exh. A,

4  Ballantyne Depo., 121:1-7.)  She testified that every time TLC received information from a prior

5  employer of a prospective driver, TLC would call Safe Harbor, but TLC failed to call Safe Harbor

6  when the Dos Palos provided information with respect to Mr. Chavez. (Doc. 38, Exh. A, Ballantyne

7  Depo., 89:1-13; 104:10-25; 108:13-25.) The information received from Dos Palos indicates that Mr.

8  Chavez' bus certificate had been revoked.  (Doc. 38, Exh. J.)  Ms. Ballantyne asserts that, had TLC

9  taken steps to communicate this information to her telephonically and explain it, as she testified was

10  TLC's practice, she would never have hired Mr. Chavez.  (Doc. 38, Exh. A, Ballantyne Depo.,

11  104:10-25.)

12      Drawing all reasonable inferences in QBE's favor and construing the testimony in the light

13  most favorable to TLC, there is sufficient evidence that a reasonable jury could conclude that TLC

14  had a duty to inform Safe Harbor that Mr. Chavez' school bus certificate had been revoked as

15  indicated by Mr. Chavez' prior employer, Dos Palos, and by the DMV printouts showing the

16  revocation. Moreover, crediting Ms. Ballantyne's testimony, a jury could find that TLC was required

17  to communicate this information and furnish an explanation to Safe Harbor (according to Ms.

18  Ballantyne, the communication was to be by telephone) in addition to forwarding the information

19  from Dos Palos.

20      **6.      Whether TLC Breached its Duty to Explain the Revocation of Mr. Chavez' Bus
21          Certificate is Materially Disputed**

22      Assuming TLC had a duty to communicate and explain Mr. Chavez' driver history to Safe

23  Harbor, Ms. Ballantyne and Ms. Mitchell's statements conflict as to whether TLC complied with its

24  duty.  Ms. Mitchell testified that when she reviewed Mr. Chavez' driver license history as provided

25  in his DMV records, Ms. Mitchell "placed a call personally to Joanie Ballantyne and explained to

26  her that [Mr. Chavez] had this special action." (Doc. 38, Exh. C, Mitchell Depo., 76:4-10.)  Ms.

27  Mitchell testified that she was informed by DMV that the codes on Mr. Chavez' DMV records

28  indicated he was no longer allowed to drive a school bus, and that was all DMV was permitted to

1  tell her.  (Doc. 38, Exh. C, Mitchell Depo., 78:1-10.)  Ms. Mitchell also testified that Mr. Chavez'

2  DMV records along with the information provided by Dos Palos as to the revocation of Mr. Chavez'

3  bus certificate were forwarded to Safe Harbor.  (Doc. 38, Exh. C, Mitchell Depo., 69:13-25; Doc.

4  42-2, Exh. C, Mitchell Depo., 69:24-70:21.)

5       Ms. Ballantyne, on the other hand, testified that she did not receive a call from TLC

6  explaining that Mr. Chavez' bus driver certificate had been revoked.  (Doc. 38, Exh. A, Ballantyne

7  Depo., 88:23-89:13; 104:10-25; 108:13-109:11.)  Instead, someone from TLC called her and told

8  her that "everything in Mr. Chavez' application was okay."  (Doc. 38, Exh. A, Ballantyne Depo.,

9  121:8-14.)[8]  She testified that she did not recall reviewing or seeing the information provided by Dos

10  Palos at the time Mr. Chavez was hired (Doc. 38, Exh. B, Ballantyne Depo., 198:15-17), but  that

11  the form from Dos Palos was in Mr. Chavez' records at Safe Harbor.  (Doc. 42-2, Exh. B, Ballantyne

12  Depo., 119:20-120:1.)

13       Ms. Ballantyne testified it was TLC's duty to call Safe Harbor and explain any problems in

14  information reported by prior employers.  (Doc. 38, Exh. A, Ballantyne Depo., 89:1-24.)  Ms.

15  Mitchell testified that TLC would typically explain the significance of anything reported by a prior

16  employer of a prospective driver to its clients.  (Doc. 38, Exh. A, Ballantyne Depo., 69:1-6.)  There

17  is a material dispute whether TLC explained the revocation to Safe Harbor because Ms. Mitchell

18  testified she called Ms. Ballantyne to communicate the revocation to her, while Ms. Ballantyne

19  testified that TLC never called her to explain the revocation of Mr. Chavez' school bus driver

20  certificate.

21       **7.    Whether TLC's Failure to Explain the Revocation of Mr. Chavez' Bus
              Certificate Caused QBE (Safe Harbor) Damage is Materially Disputed**

22

23       Essential to the element of damages, a plaintiff must establish a causal connection between

24  the breach and the damages sought.  *Thompson v. Pac. Const., Inc. v. City of Sunnyvale*, 155 Cal.

25

26          [8] Ms. Ballantyne appears to contradict this testimony in her second May 16, 2012, deposition by testifying that
    she "never got any kind of call about Gilbert Chavez." (Doc. 38, Exh. B, Ballantyne Depo., 177:12-15.)  However, in

27  context of the deposition, her statement could be interpreted to mean she never got any kind of *negative* call about Mr.
    Chavez. (*See* Doc. 38, Exh. B, Ballantyne Depo., 181:23-25 ("I never got that with Gilbert Chavez.  It was just, Okay,

28  he's a good guy.  Everything is okay.").)

1   App. 4th 524, 541 (2007).  As noted, *supra*, Ms. Ballantyne testified that had TLC informed Safe

2   Harbor that Mr. Chavez' bus driver certificate had been revoked and explained the reasons for the

3   revocation, she would not have hired Mr. Chavez.  (Doc. 38, Exh. A, Ballantyne Depo., 104:10-15;

4   Exh. B, Ballantyne Depo., 181:10-25 (had she "known anything – if someone had called [her] like

5   they usually did . . . then [she] wouldn't go any further with it")  As a result, Mr. Chavez would not

6   have been in a position to harm Ms. Diaz.

7          While Ms. Mitchell testified that DMV would not, or could not, communicate to her the

8   reasons for the revocation, QBE offers evidence that a DMV record provided to Dos Palos showed

9   that Mr. Chavez' school bus driver certificate was revoked due to "an act involving moral turpitude

10  with a nexus to the duties and responsibilities of a school bus driver as shown by the facts and

11  circumstances of the arrest for a violation of Section 273.5a of the Penal Code, Corporal Injury to

12  a spouse and Section 245a1 of the Penal Code, Assault with a deadly weapon not a gun." (Doc. 38,

13  Exh. G.)  Additionally, there were Fresno County Superior Court records related to Mr. Chavez'

14  criminal history.  (Doc. 38, Exh. F; Doc. 42-2, Exh. H.)[9]  Ms. Ballantyne testified that if TLC had

15  called to inform her about what was reported by Mr. Chavez' prior employers or by the DMV about

16  his license, she would not have hired him.  (Doc. 38, Exh. B, Ballantyne Depo., 181:10-25.)

17         Whether Mr. Chavez' criminal records and the DMV record stating the reasons for his school

18  bus certificate revocation would have been discovered had TLC called Safe Harbor to make Safe

19  Harbor aware of this information is an open question of fact, and a matter for the jury to decide.  In

20  any event, Mr. Chavez' criminal record and the DMV record detailing the reasons for his school bus

21  certificate revocation were in existence, and *could* have been discovered, perhaps by Safe Harbor,

22  had Safe Harbor known there was some adverse action taken with regard to Mr. Chavez' school bus

23

24         [9] TLC objects that QBE has not properly authenticated the Fresno County Superior Court records offered in
    support of QBE's opposition.  (*See* Doc. 42-1, ¶ 12.)  However, because TLC has submitted a properly authenticated
25  copy of this document (Doc. 42-2, Exh. H), it has been authenticated by use for all parties.  *Orr v. Bank of Am., NT &
    SA*, 285 F.3d 764, 776 (9th Cir. 2002) (holding that, "when a document has been authenticated by a party, the
26  requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party
    to present evidence to the ultimate fact-finder disputing its authenticity").  TLC also maintains the court records offered
27  by QBE are hearsay. The documents are not offered for the truth of the matter asserted – i.e., Mr. Chavez' guilt, but as
    evidence that a criminal record existed.  In any event, there is a hearsay exception for public records. Fed. R. Evid.
28  803(8).

driver certificate.   Although TLC argues this is simply supposition, the Court must draw all inferences in QBE's favor and view all testimony and evidence in the light most favorable to QBE.

In sum, there are triable issues of material fact whether TLC breached the agreement by failing to adequately inform Safe Harbor and explain that Mr. Chavez' school bus certificate was revoked.   Therefore, TLC's motion for summary judgment as to this issue is DENIED.

**F.      Insufficient Evidence to Create a Triable Issue Whether TLC Breached the Agreement by Failing to Ensure Compliance with California Vehicle Code § 12523.6**

**1.      Allegations of the Complaint**

QBE's complaint alleges that TLC was responsible to ensure that Mr. Chavez, as a driver for TLC, was properly licensed to transport individuals with disabilities.  (Cmplt., Doc. 1, ¶ 12.)  In breach of this obligation, QBE maintains that TLC failed to determine and ensure that Mr. Chavez possessed the special endorsement/certificate required by Section 12523.6 of the California Vehicle Code; TLC also breached the agreement by failing to advise TLC that Mr. Chavez did not have the special endorsement under Section 12523.6; failing to determine and ensure that Mr. Chavez underwent the criminal screening required by Section 12523.6; and failing to advise Safe Harbor that Mr. Chavez was required to undergo the screening required by Section 12523.6.  (Cmplt., Doc. 1, ¶¶ 39-42.)

**2.      TLC's Motion for Summary Judgment**

In its motion, TLC argues that the California Highway Patrol enforces Section 12523.6 of the California Vehicle Code.  (Doc. 34-2, 5:27-6:1.)  As Ms. Ballantyne testified at her first March 13, 2012, deposition that TLC's only responsibility was ensuring compliance with DMV requirements, the evidence establishes that compliance with this section was outside the scope of TLC's obligations to Safe Harbor.  (Doc. 34-2, 6:1-2.)  As a result, TLC maintains there is no evidence that it had a duty to ensure Safe Harbor's drivers' compliance with Section 12523.6 and there is, in turn, no evidence that TLC breached the agreement in this regard.  (Doc. 34-2, 6:3-9.)

**3.      QBE's Opposition to TLC's Motion**

QBE maintains that Ms. Ballantyne's second deposition testimony clarified that TLC's obligations went beyond assuring compliance only with the DMV requirements, but also included

applicable CHP requirements.  (Doc. 37, 7:28-8:3; Doc. 39, PSDF ¶¶ 3-4.)  Moreover, even

assuming TLC was only responsible for compliance with the DMV regulations, Section 12523.6 is

mandated by the DMV.  (Doc. 37, 9:6-1.)  Finally, QBE contends that had TLC made Safe Harbor

aware that Mr. Chavez was required to obtain the special endorsement, he would have undergone

the criminal background check required for issuance of the special endorsement and Safe Harbor

would have discovered Mr. Chavez' criminal history through the criminal records search performed

as part of the certification requirements under Section 12523.6.  (Doc. 37, 8:8-11.)

####        4.        TLC's Reply to QBE's Opposition

TLC asserts that DMV does not enforce the special endorsement requirements under Section

12523.6.  (Doc. 42, 8:11-15.)  Moreover, TLC argues that QBE has failed to produce any evidence

that the special endorsement required under Section 12523.6 applied to Mr. Chavez.  (Doc. 42, 7:15-

8:6.)  TLC contends that Section 12523.6(f) provides that the only drivers required to obtain the

special certificate are those who are engaged more than 50 percent of their working time driving the

disabled or more than 20 hours a week – whichever is less.  (Doc. 42, 7:15-8:6.)  TLC contends that

QBE has provided no evidence that Mr. Chavez was engaged in transporting the disabled more than

50 percent of his time working or at least 20 hours a week.  (Doc. 42, 7:15-8:6.) Without any

evidence that Section 12523.6 applied to Mr. Chavez, there is no evidence that a reasonable jury

could conclude TLC breached its duty by failing to ensure that Mr. Chavez had the special

endorsement.

####        5.        There is No Material Dispute Whether TLC Breached the Agreement by Failing to Determine and Ensure Mr. Chavez' Compliance with Section 12523.6

QBE cites to evidence sufficient to create a dispute regarding whether TLC was obligated

to ensure Safe Harbor's compliance with California Vehicle Code § 12523.6, regardless of whether

that section is mandated by the DMV or the CHP.  When construing Ms. Ballantyne's testimony in

the light most favorable to QBE and drawing all inferences in QBE's favor, Ms. Ballantyne testified

that TLC was obligated to ensure that Safe Harbor complied with DMV requirements as well as CHP

requirements pertaining to Safe Harbor's drivers.  (Doc. 38, Exh. B, Ballantyne Depo., 210:16-

211:15.)[10]  Thus, there is a dispute whether TLC was obligated to ensure that Safe Harbor's drivers met the requirements under Section 12523.6.   This dispute is only material, however, if Mr. Chavez required the special certificate under Section 12523.6.  *Celotex Corp.*, 477 U.S. at 325 ("A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

QBE contends that evidence shows that Safe Harbor's drivers, including Mr. Chavez, were not permitted to transport persons with disabilities absent a special license certificate issued by the DMV under Section 12523.6.  (Doc. 39, PSDF ¶ 5.)  In support of this, QBE cites Ms. Ballantyne's deposition testimony stating it was her understanding that Safe Harbor's drivers were required to obtain the special endorsement as set forth in Section 12523.6, which none of them had.  (Doc. 38, Exh. A, Ballantyne Depo., 29:8-23 ("apparently [Mr. Chavez] was supposed to have some sort of certificate that I was not made aware of"); 31:8-10 (all the drivers transported people with disabilities); 31:14-16 ("[a]pparently all of [the drivers] needed [the certificate] . . . [a]nd TLC never told me about it"); Exh. B, Ballantyne Depo., 221:20-25 (none of the drivers held a certificate for transporting people with disabilities).**)**

Ms. Ballantyne's testimony in this regard is only a conclusion.  It is not factual evidence that would enable a jury to conclude that Safe Harbor's drivers, including Mr. Chavez, were required to obtain the certificate under Section 12523.6, such that TLC failed to ensure compliance.  QBE's argument in this regard appears predicated on an assumption that all drivers at an adult day care center are *ipso facto* required to obtain the special certificate under Section 12523.6.  This is an incorrect assumption.

///

///

---

[10] In responding to QBE's assertion that this portion of Ms. Ballantyne's deposition supported QBE's statement of disputed fact that Safe Harbor's agreement with TLC required TLC to ensure that Safe harbor was compliant with all state laws enforced by the CHP to the extent dictated by the California Vehicle. Code, TLC argues that Ms. Ballantyne testified that "TLC did not have anything to do with the certification."  A review of the testimony reflects that Ms. Ballantyne stated that, while TLC did not have anything to do with certification, "[i]t was meeting the requirements for certification." (Doc. 38, Exh. B, Ballantyne Depo., 210:23-25.) In context, Ms. Ballantyne appears to make a distinction between CHP actually issuing or controlling a certification and TLC's obligation to help Safe Harbor meet the requirements for certification.

Section 12523.6(a)(1) provides the following:

> On or after March 1, 1998, no person who is employed primarily as a driver of a motor vehicle that is used for the transportation of persons with developmental disabilities, as defined in subdivision (a) of Section 4512 of the Welfare and Institutions Code, shall operate that motor vehicle unless that person has in his or her possession a valid driver's license of the appropriate class and a valid special driver certificate issued by the department.

Additionally, Section 12523.6(f) clarifies that

> [a]s used in this section, a person is employed primarily as driver if that person performs at least 50 percent of his or her time worked including, but not limited to, time spent assisting persons onto and out of the vehicle, or at least 20 hours a week, whichever is less, as a compensated driver of a motor vehicle for hire for the transportation of persons with developmental disabilities.

Cal. Veh. Code § 12523.6(f).

Section 12523.6 provides particular working-time thresholds that must be met before the special endorsement is required for those transporting disabled individuals. Cal. Veh. Code § 12523.6(f). The fact that Safe Harbor was an adult day care that hired drivers to transport Safe Harbor participants is insufficient to determine whether Section 12523.6 applies. There is no evidence *in the record before the Court*[11] establishing facts as to how many hours or what percentage of their working time drivers at Safe Harbor transported disabled passengers. As it relates to Mr. Chavez, whether he worked more than 20 hours per week driving disabled individuals or whether he spent more than 50 percent of his time transporting disabled persons for Safe Harbor has not been established by any evidence in the record. Additionally, Ms. Ballantyne testified that Safe Harbor had never been cited by DMV or CHP for its drivers' failure to obtain the certificate. (Doc. 42-2, Exh. A, Ballantyne Depo., 33:8-34:5.)

For QBE to create a triable issue whether TLC breached its duty to ensure compliance with Section 12523.6, QBE must present facts showing that Mr. Chavez was *required* to obtain the certificate under Section 12523.6. Not only is there an absence of evidence necessary to create a triable issue as to a breach of the agreement in this regard, there is, consequently, insufficient

---

[11] The Court notes that, pursuant to the United States District Court for the Eastern District of California's Local Rule ("Local Rule")133(j), a complete copy of Ms. Ballantyne's deposition testimony has been submitted, but it has not been filed and entered into the record in its entirety. Local Rule 133(j) provides that full deposition transcripts submitted to the court, but not filed, are not part of the official record absent an order of the court.

1    evidence of a causal connection between TLC's alleged breach and Safe Harbor's damages.

2    *Thompson*, 155 Cal. App. 4th at 541 (noting essential element of damages is establishing a causal

3    connection between breach and damages sought).  If Mr. Chavez was not required to obtain the

4    special certificate under Section 12523.6, then any breach by TLC in failing to determine this or to

5    advise Safe Harbor as to the special licensing requirements is immaterial because the criminal-

6    records check as described in Section 12523.6 would not have been mandated as to Mr. Chavez.

7          In sum, although QBE has provided sufficient evidence to establish a dispute as to whether

8    TLC undertook an obligation to ensure that Safe Harbor drivers, including Mr. Chavez, were in

9    compliance with Section 12523.6, QBE has presented no evidence to establish that any driver, and

10   particularly Mr. Chavez, was required to obtain the certificate under Section 12523.6.  The Court

11   directly asked QBE to address this issue at the hearing, but QBE could point to no evidence in the

12   record other than Ms. Ballantyne's testimony.  Moreover, the absence of evidence in this regard was

13   raised in the reply brief in response to QBE's opposition, but QBE did not seek to submit any

14   additional evidence or file a sur-reply.  As such, TLC's motion for summary judgment with respect

15   to the issue of whether TLC breached its obligations to Safe Harbor by failing to determine and

16   ensure that Safe Harbor drivers, and Mr. Chavez particularly, were in compliance with Section

17   12523.6 is GRANTED.

18   **G.    QBE's Negligence Claims**

19         QBE has asserted both a breach of contract action and a negligence cause of action against

20   TLC.  Where the negligent performance of a contract amounts to nothing more than a failure to

21   perform the express terms of the contract, the claim is one for contract breach, not negligence.  *N.*

22   *Am. Chem. Co. v. Super Ct.*, 59 Cal. App. 4th 764, 470 (1997).  However, California law also

23   recognizes the fundamental principle that accompanying every contract is a common-law duty to

24   perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and a

25   negligent failure to observe any of these conditions is a tort as well as a breach of the contract.  *Id.*

26   A plaintiff is entitled to pursue both legal theories until an occasion for such an election arises.  *Id.*

27   at 471.

28

1       As QBE's negligence claim is predicated on the duties that arose under the contract and the

2 same alleged breaches of those duties, the Court's determination as to the issues with respect to the

3 contract claim generally applies to QBE's negligence claim.  As it pertains to the alleged breach in

4 failing to discover the pursed-lips incident, there is no evidence that TLC had a duty to contact

5 former employers of Safe Harbor's prospective drivers other than to request and obtain the

6 information TLC sought from Mr. Chavez' former employer.  Moreover, to the extent that TLC had

7 a duty to explain any significant information the employer provided to TLC on the form, the pursed-

8 lips incident was not referenced on the form thereby triggering a duty of care with respect to that

9 information.  (Doc. 38, Exh. J.)  TLC also submitted the declaration of James F. Broder, which was

10 filed in support of Safe Harbor's motion for summary judgment in the *Diaz* case.  Mr. Broder

11 provided the declaration as an expert.  He opined that the employment verification TLC undertook

12 with Dos Palos "was adequate, competent and met or exceeded industry best practices." (Doc. 42-2,

13 Exh. G, ¶¶ 3-4.)  On this issue, there is no evidence that TLC failed to perform its duties in a

14 competent and reasonable manner by not discovering the pursed-lips incident.  As such, summary

15 judgment as to this issue is GRANTED.

16       As to whether TLC had an obligation to contact Safe Harbor and inform and explain to Safe

17 Harbor why Mr. Chavez' bus certificate had been revoked, the parties have presented evidence

18 establishing a triable issue of material fact as to the extent of TLC's duty and whether TLC breached

19 its duty in this regard.  As such, summary judgment as to this issue is DENIED.

20       Finally, with respect to whether TLC breached its duty to ensure that Safe Harbor's drivers,

21 and Mr. Chavez in particular, were in compliance with Section 12523.6, there is no evidence

22 indicating that any driver for Safe Harbor was required to obtain the special certificate under Section

23 12523.6.  Thus, even if TLC had a duty to simply *inform* Safe Harbor about the certification

24 requirement and leave it to Safe Harbor to determine whether its drivers needed the special

25 endorsement, if Mr. Chavez was not required to obtain the special endorsement, then any failure to

26 inform Safe Harbor about the requirements could not be shown to be causally linked to Safe Harbor's

27 damages.  As such, summary judgment as to this issue is GRANTED.

28

## IV.    CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that:

1.     TLC's motion for summary judgment is GRANTED  IN PART and DENIED IN PART;

2.     TLC's motion for summary judgment as to QBE's claims for breach of contract and negligence for TLC's alleged failure to adequately contact Mr. Chavez' prior employers is GRANTED;

3.     TLC's motion for summary judgment as to QBE's claims for breach of contract and negligence for TLC's alleged failure to inform Safe Harbor that Mr. Chavez' bus driver certificate was revoked is DENIED;

4.     TLC's motion for summary judgment as to QBE's claims for breach of contract and negligence for TLC's failure to ensure compliance with or inform Safe Harbor of the requirements of Cal. Veh. Code § 12523.6 is GRANTED.

IT IS SO ORDERED.

**Dated:    July 26, 2012**                          /s/ Sheila K. Oberto
                                              UNITED STATES MAGISTRATE JUDGE